## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HEATHER ANN THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 18-cv-3230-SEM-TSH |
| | ) | |
| JOHN R. BALDWIN, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants, JOHN BALDWIN, TERI KENNEDY, MICHAEL MELVIN, DAVID

MEREDITH, EMILY RUSKIN, and ROB JEFFREYS (sued in his official capacity as Acting

Director of the Illinois Department of Corrections), by and through their attorney, Kwame Raoul,

Attorney General for the State of Illinois, move pursuant to Federal Rule 56 for summary

judgment in their favor.

In support of their motion, Defendants provide the following brief in accordance with

local rule 7.1(D), CDIL-LR 7.1(D):

### Introduction

Plaintiff is a historian and author who initiated this action on September 13, 2018. [Doc.

1]. Plaintiff filed suit pursuant to 42 U.S.C. § 1983, alleging that Defendants violated her rights

under the First Amendment by censoring her book and also violated the Fourteenth Amendment

by failing to give Plaintiff notice that her book would be rejected at certain facilities. Plaintiff

seeks equitable relief and money damages. [Doc. 1]. Since this suit has been pending, Plaintiff

amended her complaint twice and most recently updated the Defendants included in this suit.

[Docs. 19 & 32].

1

In the operative complaint (Plaintiff's Second Amended Complaint), Plaintiff alleges that she sent copies of a book she authored, *Blood in the Water: The Attica Prison Uprising of 1971 and Its Legacy*, to three prisoners in the custody of the Illinois Department of Corrections. [Doc. 32, ¶ 1]. Plaintiff alleged that one of the books was rejected and returned with no explanation while the other two were delivered to the intended recipients at Logan Correctional Center and Stateville Correctional Center. [*Id*. ¶¶ 1, 19-22]. Even though Plaintiff mentions her successful mailing of the book to two prisoners, she seems to have abandoned her claims as to those facilities because she now includes individual claims against Defendants who worked at Pontiac CC, but she has dismissed the Defendants who were employed at Logan CC or Stateville CC during the relevant period.

Plaintiff describes her book as providing "a thorough history and analysis of the [Attica Prison] uprising, including the lead-up to the uprising, the week-long uprising itself, its brutal end at the hands of state troopers, and the protracted legal battles that ensued." [Doc. 32, ¶ 12]. In addition, Plaintiff claims that: "In examining its legacy, Thompson explains that the uprising provides a blueprint for improving the American prison system." [*Id*.] Plaintiff lists numerous awards and "high praise" bestowed upon her work.[1] [Doc. 32, ¶ 14].

Regardless of the merit and praise of Plaintiff's work, Defendants are entitled to summary judgment in this action. First and foremost, Plaintiff lacks standing to sue in this instance. Second, the prison regulations at issue do not violate Plaintiff's First Amendment rights. Third, Plaintiff may not prevail on her Fourteenth Amendment due process claim because she has no property interest at issue here and, even if she did, there are adequate post-deprivation remedies. In the

---

[1] Indeed, a number of the individuals involved in this suit seemed to enjoy the book. And, a search of the book on Goodreads.com shows a July 28, 2016, review authored by one of Plaintiff's attorneys, Alan Mills, along with a 5-star rating. (Available at: https://www.goodreads.com/book/show/28007898-blood-in-the-water?from_search=true&from_srp=true&qid=zb2hHGyBXz&rank=1).

alternative, Defendants are entitled to qualified immunity as to Plaintiff's First and Fourteenth Amendment claims.

Plaintiff also seeks equitable relief. She seeks a declaratory judgment and generic equitable relief and specifically requests an injunction to prohibit IDOC "from preventing the distribution of Plaintiff's book in the Illinois prison system." [Doc. 32, p. 9]. Defendant Jeffreys, the current IDOC Acting Director, is entitled to summary judgment on this injunctive claim. As argued more fully below, Plaintiff cannot prevail on her underlying claims. Moreover, Plaintiff's publication has not been denied at any facility except at Pontiac Correctional Center. Plaintiff also is unable to show that IDOC as a whole has a policy or practice that would deny her book without adequate justification or protections.

For these reasons, Defendants are entitled to summary judgment in their favor.

## Undisputed Material Facts

IDOC Policies and Practices at Issue

1.     The Illinois Administrative Code, title 20, Part 525, governs publications inmates may access while in IDOC custody. [Exhibit 1]. "Publication" is defined as "any book, booklet, magazine, newspaper, periodical, or similar materials." [Ex. 1, § 525.201].

2.     Publications received within IDOC facilities by mail are first to be inspected for contraband before delivery to the recipient. The inspection is conducted by mailroom staff, who determine if the publication should be reviewed by publication review. [Exhibit 5, Deposition of Meredith, pp. 13-14].

3.     If the publication "appears to violate the standards set forth in Section 525.230, the publication shall first be referred to the Publication Review Officer for review and determination." [Ex. 1, § 525.210(d)].

4.      In practice, at Pontiac CC at the relevant time and continuing to present: if mailroom staff believes a publication warrants further review, the staff member(s) will place the item in a locked box. [Ex. 5, pp. 14-15]. Meredith has a key for the locked box and will retrieve the item. [Ex. 5, p. 15].

5.      If a publication is subject to review, the offender-recipient may be notified in writing of the review and any explanation why a publication was deemed to contain unacceptable material. [Ex. 1, § 525.230(c)].

6.      Paperwork is only completed for publications that are disapproved at Pontiac; if a publication is allowed, there is no documentation done and it "just goes straight to the inmate." [Ex. 5, p. 16].

7.      "If the publication was mailed directly from the publisher, a copy of the notice will be sent to the publisher." A publisher is "allowed 21 days from the date of the notice to file an objection and to submit a written supportive statement or other documentation." [Ex. 1, § 525.230(c)].

8.      Each IDOC facility is required to maintain a current approved list of publications. [Ex. 1, § 525.210(a)].

9.      Each facility is required to have at least two employees, appointed by the CAO, to review publications as Publication Review Officers. [Ex. 1, § 525.220]. At least one of the Publication Review Officers shall be from program staff and at least one shall be from security staff. [*Id*.]

10.      The facility Publication Review officers are the first line in reviewing publications, but the Wardens and an Agency Central Publication Committee may also be involved in

determining whether to allow a publication into IDOC facilities. [Exhibit 4, Deposition of Beekman, p. 14].

11.     After the Publication Review Officer reviews the publication in its entirety, he or she will determine whether or not it meets criteria for disapproval as provided in the Departmental rule. [Ex. 4, p. 15].

12.     The Warden, also referred to as CAO, may decide whether to concur with the Publication Review Officer decision. [Ex. 4, pp. 16-17].

13.     In addition to the ability to grieve the publication denial, an inmate sometimes may request further review of the publication. [Ex. 4, p. 17]. That request may be sent to the Central Publications Review Committee for their evaluation. [*Id.*]. But, if the publication is determined to be obscene or to facilitate criminal activity, then it will not go to the Central Publication Review Committee. [*Id.*, *see also* pp. 61-62].

14.     Even if a publication is reviewed by the Central Publications Review Committee, the facility CAO has the ultimate decision-making authority on whether to allow the publication in whole, in part, or not at all. [Ex. 4, p. 61].

15.     If, after six consecutive issues of a publication have been denied, and it is determined unlikely that future issues will be approved, the publication may be banned. [Ex. 1, §525.230(f)].

16.     In addition to the provisions in the Illinois Administrative Code, IDOC also maintains an internal Administrative Directive pertaining to Publication Reviews, recently updated with an effective date of November 1, 2019. (Exhibit 3, Administrative Directive 04.01.108, eff. 11/1/2019, *compare with* version in place at relevant time at Exhibit 2).

17.    The Administrative Directive states: "It shall be the policy of the Department to review all publications entering a facility before distribution or availability is made to offenders." [Ex. 3, ¶ I.]. Publication is defined as: "any book, booklet, magazine, newspaper, periodical or similar materials. [Ex. 3, p. 1, E.]. For the purposes of the directive, "publications shall not include advertisements, pamphlets or letters including mass mailings. [*Id*.]

18.    Personal correspondence is to be handled separately in accordance with "standard mailroom procedures." [Ex. 3, p. 2].

19.    IDOC maintains a statewide list of items that have been previously disapproved or approved, and the facilities should maintain their own lists. [Ex. 4, pp. 66-67].

20.    Then, if a publication comes in that has already been listed as approved, staff may give the publication directly to the inmate without reviewing in its entirety. [Ex. 4, p. 67].

21.    Plaintiff's book, *Blood in the Water*, is not included on IDOC's statewide list of publications that have been disapproved or approved. [Exhibit 8, Excerpt of statewide publication list].

22.    IDOC policy does not require any notice to an author when something they wrote is disapproved or denied in a facility. [Ex. 4, pp. 160].

23.    IDOC policy does not require notice of disapproval to a sender of a publication unless the publication was received directly from the publisher of the publication. [Ex. 4, p. 70-72, 160; Ex. 5, p. 56].

24.    If a publication was sent directly from its publisher, the publisher would be notified if the publication was disapproved within the facility. [Ex. 4, p. 72; Ex. 5, p. 56].

25.     The term "publisher" is not defined in IDOC policies, but is understood to mean the corporation listed as being the publisher on the book or publication and which prints and distributes the publication at issue. [Ex. 4, p. 73].

Plaintiff's attempts to mail her book to IDOC inmates

26.     On February 16, 2018, Plaintiff sent via Amazon.com a copy of her book *Blood in the Water* to inmate Jami Anderson at Logan Correctional Center. [Doc. 1-2].

27.     Plaintiff purchased the book for a total of $14.89, and was issued a full refund by Amazon because the book intended for Anderson was returned to her. [Doc. 1-2].

28.     Subsequently, in February 2019, Plaintiff re-sent her book to Ms. Anderson at Logan Correctional Center, and the book was delivered. [Doc. 32, p. 6, ¶ 22].

29.     Also in February 2018, Plaintiff sent her book to inmate Joseph Sorrentino at Stateville Correctional Center, and the book was delivered. [Doc. 32, p. 6, ¶ 22].

30.     On February 16, 2018, Plaintiff sent via Amazon.com a copy of her book *Blood in the Water* to inmate Percell Dansberry at Pontiac Correctional Center. [Doc. 1-1, p. 2].

Denial of Book Sent to Dansberry

31.     Plaintiff was notified that the package for Mr. Dansberry was delivered on February 20, 2018. [Doc. 1-1, p. 2].

32.     The day after the book arrived, and for the following two days (February 21, 22, & 23, 2018) Pontiac Correctional Center had a preplanned disturbance occur in a cell house. [Ex. 5, pp. 6-7].[2]

33.     When Meredith reviewed the package, he saw "no indication in the packet at all who it come from, just that it came from Amazon, and it was sent [to Pontiac CC]." [Ex. 5, p.

---

[2] Meredith testified that it was a "riot" incident, but there has been some disagreement as to whether the disturbance rose to the level of a riot or was merely a disturbance.

153-54; Ex. 14]. In the package, Meredith only saw the book. "There was nothing inside of it or written on the package." [Ex. 5, p. 154; Ex. 14].

34.     The Pontiac riot was taken into consideration by Meredith when he reviewed the book on March 3, 2018. [Ex. 5, p. 6].

35.     The book, *Blood in the Water*, was not any disapproved publication list when Defendant Meredith reviewed the publication, and he had not seen the book before receiving it in 2018. [Ex. 5, pp. 32-33].

36.     Mr. Dansberry was notified of a Publication Review Determination and Course of Action. [Exhibit 14].

37.     Pontiac CC employee David Meredith reviewed the book *Blood in the Water* pursuant to 20 Illinois Administrative Code 525 and recommended the denial of the publication by checking four boxes indicating that it contained material determined to:

> a.   Depict, describe, or encourage activities that may lead to the use of physical violence or group disruption or it facilitates organizational activity without approval of the Chief Administrative Officer;
>
> b.   Encourage or instruct the commission of criminal activity;
>
> c.   Be otherwise detrimental to security, good order, rehabilitation, or discipline, or it might facilitate criminal activity or be detrimental to mental health; and
>
> d.   Other (Specify): contains detailed description of the Attica Prison Riot and the methods used during the riot.

[Ex. 14].

38.     Defendant Meredith explained further in his deposition that:

> The book, as I reviewed it, is incredibly detailed on how the inmates took over Attica prison. It goes over details about how an officer, through an initial altercation, was severely injured and wound up going to an outside hospital.

It goes through the process of how the inmates believed that the officer was going to retaliate against them, and a miscommunication between the staff and inmates on a line led to the inmates assaulting staff, taking them hostage and then a three-day period of negotiations ensued, which ultimately failed.

The entire process of the book, as it explains, is especially detailed on how to basically take over a prison, take hostages, and basically the end result was a number of people, 39 if I recall correctly, killed. Those that were killed in this process were done by the State of New York, state police, and there's other law enforcement agencies involved.

**But the entire process—the book explains how to take over a prison. Whether that was the intention of the book or not, that's what I reviewed it as; a guideline of how to do so.**

[Ex. 5, pp. 4-5 (emphasis added by adding bold to the last paragraph].

39.     Defendant Meredith disapproved the book because he considered it too dangerous to allow into the facility, even though he found the book to be well written. [Ex. 5, pp. 90-91].

40.     Meredith did not believe that all books concerning the Attica prison riot should necessarily be prohibited from the facility. He was asked during his deposition whether all descriptions of the Attica uprising would warrant disapproval, and he agreed that all descriptions did not require disapproval. [Ex. 5, pp. 139-40 (Q: Fair to say then that all descriptions of the Attica prison uprising don't warrant disapproval? **A: No.** . . . Q: So as the publication review officer at Pontiac, is it your opinion that only brief passing descriptions of the Attica prison uprising are admissible at Pontiac? **A: I wouldn't say brief passing ones, but as long as it doesn't go too in-depth detail of the process of instructing them of how to go about taking over a prison and taking hostages, then it shouldn't be too bad.**")

41.     On March 12, 2018, Mr. Dansberry signed the Publication Review Determination and Course of Action form and checked the box to indicate he filed a grievance to challenge the determination. [Ex.14].

42.     In a grievance dated March 20, 2018, Mr. Dansberry complained of the March 3 notice he received as to the denial of the book. [Exhibit 15, Bates 000016-17].

43.     The Chief Administrative Officer, Teri Kennedy, through her signature designee Emily Ruskin, concurred with the publication recommendation on July 10, 2018. [Ex. 14; Exhibit 7, p. 6].

44.     Defendant Kennedy trusts that her designees follow the procedure and she leaves decisions in her absence to their discretion. [Ex. 7, pp. 16-18]. Defendant Kennedy saw no need for her oversight or later review of the designee exercise of signature authority. [Ex. 7, p. 16].

45.     Ruskin did not discuss the book disapproval with Defendant Kennedy until after this lawsuit was filed against her. [Ex. 6, p. 48-49].

46.     Emily Ruskin explained that she signed the disapproval form for the book sent to Dansberry because Pontiac "had just come off a major incident" because of the Pontiac unit uprising and she felt that a descriptive book about Attica riots was not good for the security of the facility. [Ex. 6, pp. 12-13]. Ruskin also testified that she may have disapproved of the book based on Meredith's recommendation regardless of the Pontiac disturbance. [Ex. 6, pp. 13-14].

47.     On July 24, 2018, the Pontiac CC Grievance Examiner reviewed Dansberry's March 20 grievance and recommended its denial. [Ex. 15]. Plaintiff would be given 30 days from the review date to have the book disposed of or sent out via visitor. [*Id.*]

48.     The CAO Teri Kennedy, through her signature designee Emily Ruskin, concurred with the denial of Dansberry's March 20 grievance. [Ex. 15; Ex. 6, p. 41, Ex. 7, p. 37].

49.     Defendant Ruskin signed the grievance report because the Grievance Examiner laid out the facts and appeared thorough in her investigation. [Ex. 6, pp. 41-42].

50.     Ruskin did not speak to Defendant Kennedy about the grievance filed by Dansberry. [Ex. 6, p. 48].

51.     No review was done by IDOC Administrative staff concerning the denial *of Blood in the Water* to Mr. Dansberry. [Ex. 4, p. 106; Ex. 15].

52.     Echo Beekman, who is on IDOC's Central Publication Review Committee, also agreed  that general descriptions of the Attica uprising do not warrant disapproval merely because they touch on the riot. [Ex. 4, pp. 132-33].

53.     Generally, a historical account that describes activities that occurred would be approved [Ex. 4, p. 157]; however, specific instructions or details that encourage certain actions may be denied. [Ex. 4, pp. 155-156].

54.     IDOC as a whole does not presently disapprove of all publications describing the Attica prison uprising. [Ex. 4, pp. 132-133].

55.     Neither IDOC policy nor Defendant Meredith as an individual allow for the disapproval of a publication just because it has a viewpoint that is disagreeable or it has inflammatory wording. [Ex. 5, pp. 34-35].

56.     The parties have engaged experts with opposing views. [Exhibits 11 & 12]. Plaintiff's retained expert, Richard Bard, disagrees with the disapproval of the book and opined that the book "poses no threat to the safety and security of inmates or correctional facility staff in Illinois prisons" [Ex. 11, pp. 2 & 6]; whereas the defense expert, Michael Atchison, has the opinion that the book does pose a threat to the safety and security of facilities and was properly denied from Pontiac Correctional Center [Ex. 12, pp. 2 & 7].

11

## Argument

### I.    Plaintiff lacks standing to sue here.

Standing is a critical prerequisite for federal court jurisdiction. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The determination as to whether a party has standing requires analyzing three elements: (1) that the plaintiff suffered an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) there must be a causal connection between the injury and the complained of conduct; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (internal citations and quotations omitted).

### A.  Standing is not waivable.

In federal courts, standing is not an affirmative defense but rather an element that a plaintiff must plead and prove. *Native American Arts, Inc. v. The Waldron Corp.*, 253 F.Supp.2d 1041, 1044-45 (N.D. Ill. Jan. 22, 2003); *but cf. Acuity Optical Lab. v. Davis Vision, Inc.*, 2014 WL 5900994, *4 (C.D. Ill. Nov. 13, 2014) (court declined to strike affirmative defense related to standing given differing views on standing as an affirmative defense, and fact that state claims were at issue and Illinois courts require standing to be pled and proven by defendants). Standing is a jurisdictional requirement that must be independently addressed by the Court. *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998) ("Even where the parties agree that the plaintiffs have constitutional standing, we have to satisfy ourselves that this jurisdictional requirement is met."). Here, because this Court is determining federal claims raised under § 1983, and there are no Illinois statutory or common law claims, standing is not an affirmative defense nor may it be considered waived here.

**B.  Plaintiff cannot meet her burden to establish that she has standing.**

It is Plaintiff's burden to show that she has standing to sue. *Lujan*, 504 U.S. at 561. At the summary judgment stage, the party invoking federal jurisdiction must set forth facts through admissible evidence and must prove each element "with the manner and degree of evidence required at the successive stages of the litigation." *Id*. Here, Plaintiff has the burden of establishing the elements of standing by a preponderance of the evidence consistent with claims brought under 42 U.S.C. § 1983.

Neither Plaintiff's status as the author of the declined publication nor the praise given to her work are sufficient to bestow a special legal interest to the Plaintiff in this instance. In her complaint, Plaintiff acknowledged that the Fourteenth Amendment may be violated where procedural safeguards are not followed as a applied to a publisher. [Doc. 32, p. 5, ¶ 17]. A book publisher or seller may have standing to assert a claim based on the denial of a book. *See, e.g., Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n. 6 (1963). Plaintiff's book was not self-published but rather was published by Pantheon Books. [Exhibits 9 & 10]. It was subsequently published by Vintage Books, a division of Penguin Random House LLC. [Exhibit 9]. Plaintiff does not have standing to assert any claim on behalf of a book publisher.

Such standing for publishers and, potentially for inmates, is built in to IDOC's rules as to publication review—notice is given to the inmate and, if sent directly from the publisher to the prison, to the publisher as well. Both the inmate and the publisher have options to appeal the publication denial. When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed" to establish standing. *Lujan*, 540 U.S.at 562. However, Plaintiff's role as the purchaser of a book does not necessarily give her standing to challenge IDOC's policies with respect to her book.

Although Plaintiff was both the author and the sender of the package to Mr. Dansberry, Plaintiff has no standing to challenge the denial of the package to Dansberry. The only item withheld from Dansberry was the book, as Defendant Meredith did not see anything other than the book inside of the Amazon package addressed to Dansberry. [Ex. 5, pp. 154-54; Ex. 14]. There were no restrictions on Plaintiff's ability to communicate or correspond with any of the inmates or even with Dansberry, specifically.

Plaintiff fails to meet each of the elements set forth in *Lujan*. The "injury in fact" element must be met by something "more than an injury to a cognizable interest. It requires that the party seeking review be himself [or, herself] among the injured." 504 U.S. 563. While Plaintiff alleged that she suffered and may continue to suffer an injury—specifically the "suppression of a political message, loss of supporters and readers, and loss of sales" [Doc. 32, pp. 6-7, ¶ 23]—such allegations do not line up with the facts. Furthermore, Plaintiff cannot show a causal connection between the injury alleged and the conduct at issue. The Departmental policies at issue did not cause the denial of her book. Plaintiff cannot assert such broad sweeping claims against the entire Department because her book was denied at one facility. Finally, a decision in Plaintiff's favor cannot likely redress the claimed injury to Plaintiff—Plaintiff's message is not being suppressed, IDOC as a whole is not causing Plaintiff to lose readers, and the only sales she is losing seem to be the ones she is paying for, as she purchased all three books through Amazon. For these reasons, Plaintiff has not suffered an injury to support her claims here, and Plaintiff lacks standing to sue.

## II.    The claims against Baldwin, Melvin, and Kennedy should be dismissed because these individuals were not sufficiently involved with Plaintiff's claims.

Plaintiff sued Defendants Baldwin, Melvin, and Kennedy in their individual capacities. Although Plaintiff also sued Baldwin in his official capacity for equitable relief, that claim will be addressed below in Section VI. Moreover, Baldwin is no longer the Acting Director of IDOC so

the official capacity claim automatically passed to his successor, Rob Jeffreys. *See* Fed. R. Civ. P. 25(d).

These three Defendants may not be liable in their individual capacities. Liability under § 1983 arises only when a plaintiff can show that a defendant was "personally responsible for a deprivation of a constitutional right." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). The doctrine of respondeat superior does not apply to § 1983 actions. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690-95 (1978); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).

These Defendants—Defendants Baldwin, Melvin, and Kennedy—are entitled to judgment in their favor because Plaintiff cannot show that they engaged in the conduct Plaintiff complains of. Personal involvement is a prerequisite for individual liability in a § 1983 action. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997), *citing Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Individuals who were not present or involved in the complained-of actions cannot have personal involvement. *See, e.g., Gossmeyer*, 128 F.3d at 495.

A plaintiff must show that each named defendant was personally responsible. *See Harris v. Greer*, 750 F.2d 617 (1984) (plaintiff's "complaint must fail for want of any allegation that the defendants were personally responsible for the confiscation and harassment"; further, there is no concept of supervisor strict liability under § 1983). The Seventh Circuit Court of Appeals has recently acknowledged the burden required of a plaintiff opposing summary judgment in a § 1983 action. In *Colbert v. City of Chicago*, the court was explicit: "[I]n light of § 1983's individual-responsibility requirement, the plaintiff opposing summary judgment in this context must at a minimum have (1) pled a claim that plausibly forms a causal connection between the official sued

and some alleged misconduct, *and* (2) introduced facts that give rise to a genuine dispute regarding

that connection." 851 F.3d 649, 658 (7th Cir. 2017). While that case involved several allegations

related to a seizure and arrest, the requirements under § 1983 extend to this matter as well.

The book that Plaintiff purchased for Dansberry was flagged by mailroom staff, reviewed

by Defendant Meredith, and the denial was later approved by Defendant Ruskin on behalf of CAO

Teri Kennedy, but she did not discussed it with Kennedy contemporaneously with the decisions.

[Ex. 6, pp. 48-49; Ex. 7, pp. 16-18]. Neither Defendants Baldwin nor Melvin made a decision with

respect to the denial to Dansberry or even to the publication. Defendants Baldwin, Melvin, and

Kennedy were named in this suit based on their titles and cannot be said to have had personal

involvement with any denial of Plaintiff's book. Accordingly, there is not sufficient involvement

for liability to attach, and they are entitled to summary judgment on the claims brought against

them.

### III.    Even if Plaintiff has standing to assert a First Amendment claim here, Defendants are entitled to summary judgment because the policies at issue do not violate Plaintiff's First Amendment rights.

The First Amendment states: "Congress shall make no law . . . abridging the freedom of

speech, or of the press; or the right of the people peaceably to assemble, and to petition the

Government for a redress of grievances." U.S. Const. Amend. I. However, the First Amendment is

not absolute. *See Roth v. United States*, 354 U.S. 476 (1957), *aff'd, Miller v. California*, 413 U.S.

15 (Obscene material is not protected by the First Amendment).

The First Amendment rights of detained individuals may be curtailed if a regulation that

impinges on constitutional rights is reasonably related to legitimate interests. *Turner v. Safley*, 482

U.S. 78, 89 (1987). The *Turner* test is not merely applicable to mail sent between inmates, but also

to correspondence sent to and from private citizens. *Thornburgh v. Abbott*, 490 U.S. 401, 413 n. 9

(1989). As noted above, what we are dealing with here is not actually mail or correspondence in the general sense, but a book that Plaintiff ordered from a third party and shipped to the inmates. As mentioned above, no note was included in the Amazon envelope sent to Dansberry. [Ex. 5, p. 154; Ex. 14].

Regardless of whether Plaintiff has standing to bring such a claim, the factors set forth in *Turner* are relevant to consideration of a First Amendment claim like that alleged here. Although prisoners retain rights under the First Amendment and free citizens have the right to reach out to prisoners, their interests must be balanced against the administration of prisons. *Thornburgh*, 490 U.S. at 407. And, regulations affecting the sending of a publication should be analyzed under the *Turner* standard. *Thornburgh,* 490 U.S. at 413. Prisons have "great latitude" to restrict prisoners' access to reading materials as long as the *Turner* test is met. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009), *see also Thornburgh*, 490 U.S. at 417 n. 15; *Turner*, 482 U.S. at 89.

The *Turner* factors consider: (1) whether there is a valid, rational connection between the regulation and legitimate governmental interest; (2) whether there are alternative means of exercising the right; (3) the impact accommodation of the asserted constitutional right will have on guards and other detainees, and on the allocation of facility resources generally; and (4) absence of ready alternatives. 482 U.S. at 89-91.

Here, the regulation at issue has a rational connection with a legitimate governmental concern. The book at issue was denied, in part, because it contains a detailed account of a historical prison riot and Pontiac Correctional Center had just had an inmate disturbance days before the publication was reviewed. [Ex. 5, pp. 6-7].  Defendant Meredith also recommended the denial of the publication specifically for: (a) depicting, describing, or encouraging activities that could lead to the use of physical violence or group disruption or facilitating unapproved organizational

activity; (b) encouraging or instructing the commission of criminal activity; (c) otherwise being detrimental to security, good order, rehabilitation or discipline; and, (d) because it "contains [a] detailed description of the Attica Prison Riot and the methods used during the riot." [Ex. 14]. As he explained, he saw that the book was detailed on how the inmates took over the prison. [Ex. 5, pp. 4-5]. Even though the book was well written, Meredith considered it too dangerous to allow into the facility. [Ex. 5, pp. 90-91].

Limitations of such materials have been viewed as valid and having logical connections with legitimate security issues.  In *King v. Federal Bureau of Prisons*, 415 F.3d 634, 638-39 (7th Cir. 2005), the Seventh Circuit distinguished the computer programming book at issue from books that may be denied for penological reasons. There, the court wrote: "A prison need not allow prisoners to buy books detailing famous prison escapes, or even, we suppose, books on how to make yourself as strong as Mike Tyson through exercise." *Id*. (internal citations omitted).

In *Mays*, an inmate-plaintiff complained of the censorship and removal of pages from an issue of a magazine that had been mailed to him. 575 F.3d 642, 646 (7th Cir. 2009). Prison officials expressed concern over an article that "described a violent prison riot," and the prison's publication review board sent the magazine to the Agency review board, which ordered the removal of the article along with other pages containing photographs of gang signs. *Id*. The Seventh Circuit affirmed judgment as a matter of law granted for prison officials, reasoning that "it takes no great leap to understand the prison's reasons for wanting an article about a prison riot and inmates of gang signs kept away from inmates." *Id*. at 649.

Yet, IDOC does not have a regulation that bans all publications that discuss riots. Instead, IDOC regulations allow for an individualized assessment at the facility level for most publications. There is no blanket ban on all publications that discuss the Attica riot. And, Defendant Meredith,

18

who reviewed Plaintiff's book at Pontiac and denied it, believes a book on the riots would be allowed as long as there is not the same level of detail as in Plaintiff's book as to taking over a prison or taking hostages. [Ex. 5, pp. 139-40]. Here, the denial of a book was based on an individualized determination that the book was too dangerous to allow into the facility. For these reasons, the denial of Plaintiff's book has a valid, rational connection to a legitimate governmental interest.

As to whether there are alternative means—it is clear that Plaintiff is not denied the opportunity to correspond with Dansberry or other inmates, if that is her goal. If her goal is to provide information as to the Attica riot, the inmates in IDOC custody are not prohibited from reading *all* materials that reference that event. Plus, IDOC has not imposed a blanket, state-wide ban on Plaintiff's book, so she is still free to share it with inmates at other facilities. There is no alternative here based on Plaintiff's claims—either the book is allowed in or it is not—and, as discussed above, the denial there is valid and legitimate. The impact of accommodating Plaintiff's demand that her book be allowed into all facilities would deprive prison administrators of the discretion they need to manage their facilities. Even where there is a difference of opinion and the Central Publication Review Committee reviews a facility-level denial, the facility CAO has the ultimate decision-making authority on whether to allow it. [Ex. 4, p. 61].

For these reasons, this Court should grant summary judgment against Plaintiff on her First Amendment claim.

IV.    **Plaintiff has no cognizable property right and cannot otherwise pursue a due process claim in this instance.**

In order to state a claim for a procedural due process violation based on a property right, a plaintiff "must establish: (1) a protected property interest; (2) a deprivation of that property interest by someone acting under the color of state law; and (3) a denial of due process." *Booker-*

*El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 900 (7th Cir. 2012), *citing Tenny v. Blagojevich*, 659 F.3d 578, 581 (7th Cir. 2011). "[T]he threshold question is whether a protected property interest actually exists." *Id., quoting Cole v. Milwaukee Area Technical Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).

Because the U.S. Constitution does not detail or provide property interests, a plaintiff must identify a state law or other independent source of law that would create a protected property interest. *Thornton v. Barnes*, 890 F.2d 1380, 1386 (7th Cir. 1989). Yet, there is no state law or even an administrative rule that would create a property interest for Plaintiff. Publishers have been granted a protected interest in their publications (*Thornburgh, Bantam*, cited *supra*); however, that right has not been extended to the author of a publication. And, no regulations grant Plaintiff the ability or opportunity to challenge the publication denial at issue.

Even if we assumed for the sake of argument that Plaintiff had a protected interest as the sender of the item, there was no way for the prison to know who sent the item to Dansberry. There was no note and the return address was to Amazon. [Ex. 14]. Although Dansberry filed a grievance to complain of the denial, Dansberry also made no mention of Plaintiff in the grievance that he filed. [Ex. 15]. Further, Dansberry was able to send the publication out of the facility or via a visitor. [Ex. 15]. This is a sufficient post-deprivation remedy for the purchase of the book, as it could have been returned to Plaintiff. *See Hudson v. Palmer*, 468 U.S. 517, 533 & 535 (1984) (holding there may be no due process claim for the intentional deprivation of property if there is a suitable post-deprivation remedy).

Because Plaintiff has no cognizable property right and yet there was a suitable post-deprivation remedy after the disapproval of her book, this Court should enter summary judgment in favor of Defendants.

**V.    In the alternative, Defendants are entitled to qualified immunity as to Plaintiff's First and Fourteenth Amendment claims.**

Government officials performing discretionary functions are generally shielded from liability or civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). This qualified immunity protects state officials from liability as well as from the burden of standing trial. *See Saucier v. Katz*, 533 U.S. 194 (2001); *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). The court must decide whether a plaintiff has alleged facts that if proved would show a violation of a constitutional right. *Saucier*, 533 U.S. at 201. The court also determines whether that right was clearly established at the time of the alleged violation. *Id.* The court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To defeat a qualified immunity defense, the plaintiff bears the burden of demonstrating that the legal norms allegedly violated by a defendant were clearly established at the time of the challenged actions or the law clearly proscribed the actions the defendant took. *Mitchell v. Forsyth*, 472 U.S. 511 (1985). The words "clearly established" cannot be used by stating constitutional rights in the most general possible terms; the right must be sufficiently particularized to put defendants on notice that their conduct is probably unlawful. *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). While the Supreme Court case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate**.** *Kisela v. Hughes,* 138 S.Ct. 1148, 1152 (2018) (internal citations omitted) (emphasis added). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal citations omitted).

21

Courts must accord substantial deference to the professional judgment of administrators, "who bear a significant responsibility for defining the legitimate goals [of a detention system] and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden is not on the State to prove the validity of its regulations, but on the petitioner to disprove their validity. *Id*. While a court is not required to accept bare assertions, the government must provide a legitimate and neutral objective with a logical connection between the regulation and asserted goal. *Turner*, 482 at 89-90; *Brown*, 801 at 854-55. IDOC has a legitimate reason for denying a publication that details a prison riot. This is the type of material that reviewing courts have approved of denying into prison walls. *See, e.g., Mays,* 575 F.3d at 649; *Turner v. Pollard*, 564 Fed. Appx. 234, 237 (7th Cir. 2014) (affirming summary judgment on inmate-plaintiff's First Amendment challenge to the confiscation of speech promoting slavery and for organizing activities deemed gang-related where there was concern over promotion of "unrest, violence, and unsanctioned gang activity"); *Toston v. Thurmer*, 689 F.3d 828, 830 (7th Cir. 2012) (affirming the dismissal of inmate-plaintiff's First Amendment claim based on the confiscation of his hand-written copy of Ten-Point Program that was in prison library but determined to be connected to gang activity and potentially incite violence).

Here, Plaintiff seeks to prove that her book has merit, that it should be let in to Pontiac Correctional Center on that basis, and she should be personally allowed to challenge any denials. But, that is not consistent with the law that has been in place thus far. An action involving IDOC officials out of the Northern District of Illinois, *Gray v. Cannon*, is instructive for this case. 974 F.Supp.2d 1150 (N.D. Ill. 2013). There, as here, plaintiffs brought First Amendment and Fourteenth Amendment challenges to the denial of photographs and publications sent to them. There, the district court found that the plaintiffs lacked standing to assert claims on behalf of the publishers of

22

some of the denied publications. *Id*. at 1163. In *Gray*, the court reviewed the *Turner* factors and found that the denial of a series of publications was permissible under the First Amendment. It also found that each item did not require an individualized inspection because "[i]t does not follow that the First Amendment *requires* that prisons closely inspect every individual publication to determine whether it poses a threat to prison security." *Id*. at 1161. And, the district court also granted summary judgment because the inmate-plaintiffs who were denied the materials were allowed to grieve the rejection decisions. *Id*. at 1164-66, *citing to Matamoros v. Grams*, 706 F.3d 783, 790 (7th Cir. 2013) ("The purpose of notice under the Due Process Clause is to allow an interested party to challenge the deprivation of a protected liberty interest before it occurs."). In *Gray*, summary judgment was granted to the IDOC officials. Based on this case law, Defendants would not be on notice that there was a legal issue with the publication policies at issue. And, similarly, for the reasons discussed in *Gray*, these Defendants are entitled to summary judgment in their favor.

While there is some disagreement between the experts as to whether the book poses a security risk inside IDOC facilities (UMF ¶ 56), and there may be other individuals who second-guess the denial of this book at Pontiac CC, the denial should be afforded considerable deference. *Thornburgh*, 490 U.S. at 408 ("this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."). Qualified immunity is in place to balance two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It covers mistakes in judgment regardless of whether the officials made a mistake in fact or of law or both . *Id*. Based on all of the facts in this action, and the case law in place, Defendants would be entitled to qualified

immunity even if this Court were to disagree with the disapproval at issue and the failure to provide direct notice to Plaintiff of the disapproval.

For these reasons, Defendants enjoy qualified immunity as to the Plaintiff's claims.

**VI.    Plaintiff cannot meet her burden for issuance of a permanent injunction.**

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). It is a plaintiff's burden to establish that: (1) she has suffered irreparable injury; (2) the remedies available at law are inadequate to compensate her for that injury; (3) the benefits of granting the injunction outweigh the injury to the Defendants; and (4) the public interest would not be harmed by a permanent injunction. *Id.*; *see also ADT Security Svcs Inc. v. Lisle-Woodridge Fire Protection Dist.*, 672 F.3d 492, 498, (7th Cir. 2012), *citing Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). In addition, a plaintiff must ultimately be able to succeed on the merits of her case. *E.g., Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).

This matter is distinguishable from *Backpage.com v. Dart*, 807 F.3d 229 (7th Cir. 2015). There, the Sheriff of Cook County, in his official capacity, refused to process credit card transactions bearing the names of credit card companies that were used to advertise on the website Backpage.com. *Id*. at 230. Backpage sought a preliminary injunction claiming that the Sheriff was curtailing its freedom of expression. *Id*. The Seventh Circuit discussed how intimidation of ideas through the imposition of government power or sanction violates the First Amendment. *Id*. at 230-31. The court found that there was a "campaign of suffocation" by the Sheriff that would be bound to cause irreparable injury to Backpage and it ordered the district court to issue an injunction to Backpage. *Id*. at 238-39. Here, there is nothing resembling a governmental threat or "campaign of suffocation" to deny Plaintiff her ability to present her work. Rather, instead, there was an

individualized assessment of her work that resulted in one facility denying her book into its walls. Based on the facts at issue here, there is no irreparable harm at issue.

As argued above, Plaintiff cannot succeed on the merits of her case. Plaintiff will also not be able to show irreparable injury based on the denial of her book to Dansberry. Dansberry had the opportunity to have the book sent out to anyone, including to the Plaintiff if they agreed to do so. Accordingly, Plaintiff could have been made whole for her purchase by this arrangement. And, Plaintiff seeks injunctive relief against the entire Department concerning her book, even though her book is not disallowed on a Department-wide basis. [Ex. 8]. Plaintiff's request for injunctive relief is overly broad in light of the one denial at issue. *See Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019), *quoting Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (to satisfy standing for equitable claim, a plaintiff must demonstrate a real and immediate threat of future injury, "a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief."). Further, Plaintiff cannot meet the third or fourth elements of the test. She is attempting to change IDOC policies and practices even though they are facially valid. She cannot show that the entry of an injunction will outweigh the injury to Defendants or that the public interest would not be harmed. For all of these reasons, Plaintiff cannot pursue a claim for equitable relief against the IDOC Director.

### Conclusion

In conclusion, Defendants are entitled to summary judgment in this action. Plaintiff lacks standing to sue them. Even if Plaintiff had standing, Defendants would prevail on the First and Fourteenth Amendment claims. Plaintiff cannot establish that her rights were violated by the actions at issue here. Similarly, Defendants would enjoy qualified immunity as to each of her constitutional claims. Furthermore, Plaintiff lacks evidence to support individual claims against

Defendants Baldwin, Kennedy, and Melvin. And, Plaintiff cannot provide a basis to proceed on her request for equitable relief against the IDOC Acting Director. All of Plaintiff's claims should be dismissed, and judgment entered for the Defendants.

WHEREFORE, Defendants respectfully request that this Court grant their motion and enter summary judgment in favor of Defendants.

Respectfully submitted,

ROB JEFFREYS (in his official capacity), TERI KENNEDY, MICHAEL MELVIN, DAVID MEREDITH, EMILY RUSKIN, and JOHN BALDWIN

Defendants,

Lisa Cook, # 6298233
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62701
(217) 785-4555 Phone
(217) 524-5091 Fax
Email: lcook@atg.state.il.us

KWAME RAOUL, Illinois Attorney General,

Attorney for Defendants,

By:    s/Lisa Cook
       Lisa Cook
       Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HEATHER ANN THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 18-cv-3230-SEM-TSH |
| | ) | |
| JOHN R. BALDWIN, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2020, the foregoing document, ***Defendants' Motion for Summary Judgment***, was electronically filed with the Clerk of the Court using the CM/ECF system which will electronically send notice to:

| | |
|---|---|
| Angelo J. Suozzi | asuozzi@sidley.com |
| Bridget Kate Geraghty | bridget@uplcchicago.org |
| Leslie Elaine Kuhn-Thayer | lkuhntha@sidley.com |
| Benjamin Brunner | bbrunner@sidley.com |
| Eric Mattson | emattson@sidley.com |
| Jillian Stonecipher | jstonecipher@sidley.com |
| Alan Mills | alan@uplcchicago.org |
| Nicole Schult | nicole@uplcchicago.org |

s/Lisa Cook
Lisa Cook, #6298233
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62701
(217) 785-4555 Phone
(217) 524-5091 Fax
E-mail: lcook@atg.state.il.us