### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| **HEATHER ANN THOMPSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18-cv-3230** |
| ) | |
| **JOHN R. BALDWIN,** ) | |
| **MICHAEL MELVIN,** ) | |
| **TERI KENNEDY,** ) | |
| **DAVID MEREDITH,** ) | |
| **EMILY RUSKIN, and** ) | |
| **ROB JEFFREYS,** ) | |
| ) | |
| **Defendants.** ) | |

### <u>OPINION</u>

**SUE E. MYERSCOUGH, United States District Judge:**

This is an action under 42 U.S.C. § 1983, wherein Plaintiff
Heather Ann Thompson alleges Defendants violated her First and
Fourteenth Amendment rights. Before the Court are the Plaintiff's
Motion for Partial Summary Judgment as to Count II [d/e 68] and
Defendants' Motion for Summary Judgment as to Counts I and II [d/e
70]. Because the Defendants are entitled to qualified immunity on
the Plaintiff's constitutional claims and Plaintiff cannot establish a
likelihood of success on the merits as to her equitable claims, the

Court Denies Plaintiff's Motion for Partial Summary Judgment and Grants Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

### The parties and claims

Plaintiff Heather Ann Thompson, Ph.D., is a professor of history at the University of Michigan.  In 2016, she published <u>Blood in the Water: The Attica Prison Uprising of 1971 and its Legacy</u>, a book about the infamous 1971 prison uprising at Attica, New York, that claimed the lives of 33 inmates and 10 correctional officers.  The book received a number of awards, including the 2016 Bancroft Prize and the 2017 Pulitzer Prize in History.   Dr. Thompson focuses her scholarship and public advocacy on mass incarceration and regularly corresponds with incarcerated people.   In February 2018, Dr. Thompson sent copies of her book to several people incarcerated within the Illinois Department of Corrections ("IDOC").  One such individual was Percell Dansberry, a prisoner at Pontiac Correctional Center.  Because the book was banned from Pontiac entirely, the book never reached Mr. Dansberry.

IDOC regulations prohibit publications from entering IDOC facilities without first undergoing a through, three-level review.

David Meredith, a correctional officer and one of the Defendants, determined Dr. Thompson's book was too dangerous for a maximum security prison and sent Mr. Dansberry a formal censorship notice and disposed of the book.  Pontiac did not advise Dr. Thompson, her publisher, or the bookseller of that decision.

Defendant John Baldwin, the former Acting Director of the IDOC, was initially sued in both his individual and official capacities. As Mr. Baldwin is no longer in IDOC's employ, he remains in this suit only in his individual capacity.  See Answer, d/e 36, at 4 n.7.

Defendant Rob Jeffreys is the Acting Director of IDOC, a position he has held since June 3, 2019.  Dr. Thompson sues Mr. Jeffreys in his official capacity for declaratory and injunctive relief. See id.

Defendant Michael Melvin served as warden of the Pontiac Correctional Center, a facility operated by IDOC, until April 1, 2018. Dr. Thompson sues Mr. Melvin in his individual capacity.  See id., at 5 n.8.

Defendant Teri Kennedy is Pontiac's current warden and has been so employed since April 1, 2018.  Dr. Thompson sues Ms. Kennedy in her individual capacity.  See id.

Defendant David Meredith is a correctional officer at Pontiac. He also served, at all relevant times, as Pontiac's designated publication-review officer. Dr. Thompson sues Mr. Meredith in his individual capacity. See id. at 6 n.9 .

Defendant Emily Ruskin is Pontiac's assistant warden for programs. Dr. Thompson sues Ms. Ruskin in her individual capacity. See id. at 6-7, n.9.

Dr. Thompson filed suit claiming in Count I that Defendants violated her First Amendment rights by censoring her book without legitimate or adequate reason. Dr. Thompson also alleges in Count II that Defendants violated her Fourteenth Amendment right to procedural due process by providing her neither notice of the censorship nor a reasonable opportunity to challenge that decision. Dr. Thompson seeks equitable relief and damages.

Dr. Thompson now moves for summary judgment on Count II, her procedural due process claim. See d/e 68. Defendants seek summary judgment on both Counts I and II. See d/e 70.

### IDOC's publication-review procedures

IDOC has promulgated a series of regulations that enable its facilities to determine what books are safe for inmates' reading. 20

Ill. Admin. Code § 525 <u>et</u> <u>seq</u>. (2006) ("Section 525").  The regulations charge IDOC facilities with reviewing any "publications"—books, magazines, newspapers, or other periodicals—given to, sent to, or ordered by an inmate.  <u>See</u> <u>id</u>. § 525.10.  Section 525 assigns this task to designated "Publication Review Officers."  Each IDOC facility must have two such officers.  <u>Id</u>. § 525.220.

Section 525 generally entitles inmates to receive publications that do not fit into one of two prohibited categories.  <u>Id</u>. § 525.210(c). A Publication Review Officer may recommend censoring a publication if he finds the publication "obscene," as the term is defined under Illinois law.  <u>Id</u>. § 525.230(a)(1).  He may also recommend censoring a publication he finds "[d]etrimental to security, good order, rehabilitation, or discipline if it might facilitate criminal activity, or be detrimental to mental health needs of an offender as determined by a mental health professional."  <u>Id</u>. § 525.230(a)(2).  Publications that fit into neither category must be added to the facility's "approved list" and "delivered promptly" to the intended recipient. <u>Id</u>. § 525.210.

The second category upon which a Publication Review Officer may base a censorship recommendation encompasses a broader swath of material than does the first.  In February 2018, when <u>Blood</u>

in the Water arrived at Pontiac, a publication that met any one of seven criteria could be rejected under § 525.230(b).

There are several rounds of review for any publication not found on the facility's approved list.  See generally § 525.210; see also d/e 68, Exh. 8, at 5-6.  Section 525 first requires mailroom staff to inspect a newly received publication for contraband or improper alterations. 20 Ill. Admin. Code § 525.210(d).  If the publication clears that hurdle, mailroom staff then determines—through at least a cursory analysis of its contents—whether the publication warrants further review.  See id.

If the publication warrants further review, the publication must be turned over to one of the facility's two Publication Review Officers, who then review the publication for a determination.  Id. § 525.210(d).  If the officer finds that the publication complies with IDOC's standards, the process ends there.  If, however, the officer finds otherwise, he must prepare a "recommendation for denial," provide the recommendation to the facility's warden for sign-off, and inform the recipient-inmate of the recommendation and its rationale. 20 Ill. Admin. Code § 525.230(c).

Upon receiving a censorship notification, the prisoner and the publisher, if the publication was mailed directly from the publisher, may respond in writing. Id. "Any recommendation for denial shall be forwarded to the Chief Administrative Officer with an explanation." Id. § 525.230(d). If the Chief Administrative Officer, or Warden, agrees with the recommendation, then the publication is disapproved. Id. Any publication deemed "unacceptable" must "be disposed of as contraband." Id. § 525.210(e).

### Pontiac's review of Blood in the Water

Defendant David Meredith was a correctional officer at Pontiac and served as Pontiac's sole Publication Review Officer. Therefore, the decision whether to allow a new publication within Pontiac largely rested with him.

Dr. Thompson's book arrived at Pontiac on February 20, 2018. Mr. Meredith testified at his deposition that the day after the book arrived, a major riot incident occurred which lasted a total of three days in one of the cell houses, though not where Mr. Dansberry was housed. See d/e 70-5, at 6-7. Mr. Meredith testified he took that incident into consideration when reviewing the book two weeks. Id. at 6. He read "40 to 50" pages of the 720-page book before

7

determining that the book should be censored.  Id. at 88.  He testified

in his deposition that he believed the book to be too dangerous to

allow into Pontiac, explaining:

> The potential was there for him to use that as a potential
> guideline and process by which to take a hostage, take over an
> institution, talks about overpowering guards, it talks about
> injuring staff.  The potential was there.  The potential is always
> there.  As obvious by the fact that the day after this book arrived
> at the institution, we had a major uprising in a cell house.  And
> the officer in question who was injured, if he had fallen in the
> gutter, he would have been taken hostage, and then it would
> have been a hostage situation and a riot just like this book.

Id. at 91-92.

Pursuant to IDOC's internal directives, Mr. Meredith completed

a "Publication Review Determination and Course of Action" form and

found that Blood in the Water met three specified criteria for

disapproval:

- It depicts, describes, or encourages activities that may lead
  to the use of physical violence or group disruption or it
  facilitates organizational activity without approval of the
  Chief Administrative Officer;
- It encourages or instructs in the commission of criminal
  activity;
- It is otherwise detrimental to security, good order,
  rehabilitation, or discipline or it might facilitate criminal
  activity or be detrimental to mental health.

Id. at 101-114.  Mr. Meredith also checked a box labeled "Other."  Id.

at 114.  Next to it, Mr. Meredith noted that the book contains "a

detailed description of the Attica Prison Riot and the methods used during the riot." Id. at 115.

Upon receiving Mr. Meredith's notice on March 12, 2018, Mr. Dansberry, the book's intended recipient, filed a grievance, claiming that Mr. Meredith violated Section 525 by failing "to forward denial to the Chief Administrative Officer for his concurrence and signature." Mr. Dansberry also wrote that Blood in the Water was "an historical account of a widely known, publicly known event in America," and that it "encourages and advocates violence [no] more than a . . . cowboy movie."

Defendant Teri Kennedy—through her signature-designee Emily Ruskin, Pontiac's assistant warden for programs—concurred with Mr. Meredith's recommendation on July 10, 2018. Neither Warden Kennedy nor Ms. Ruskin read Blood in the Water before doing so.

**PRELIMINARY ISSUES**

The Defendants raise two issues that may prove dispositive. The Court addresses both issues in turn.

### **Dr. Thompson's standing**

9

The Defendants first allege Dr. Thompson lacks standing because she lacks any "special legal interest" in the outcome of the case.  <u>See</u> d/e 70, at 13.  The Defendants contend that neither Dr. Thompson's "role as the purchaser of a book" nor her "status as the author of the declined publication" entitle her to challenge the fact or means of her book's censorship.  <u>Id</u>.  Instead, Defendants say Dr. Thompson's claim lies within the exclusive province of publishers, booksellers, and prisoners—like Mr. Dansberry.  <u>Id</u>. at 13-14.

In order to viably allege standing, a plaintiff must show (1) that she suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely a favorable decision will redress the injury.  <u>Berger v. Nat'l Collegiate Athletic Ass'n</u>, 843 F.3d 285, 289 (7th Cir. 2016); <u>see generally</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).

Dr. Thompson alleges that, as the "author and sender of <u>Blood in the Water</u>," <u>see</u> d/e 72, at 1, she enjoys no fewer protections from arbitrary censorship and denial of procedural due process than do the book's publisher, its seller, or the prisoner who wishes to read it.  <u>See</u> <u>id</u>. at 16.  The Court agrees.  "Prison walls do not . . . bar free citizens from exercising their own constitutional rights by reaching

out to those on the 'inside.'" <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 407 (1989).  Dr. Thompson's desire to distribute her book to incarcerated individuals "is precisely the type of interest at the core of First Amendment protections."  <u>Prison Legal News v. Livingston</u>, 683 F.3d 201, 212 (5th Cir. 2012).  The Court concludes, therefore, that Dr. Thompson has sufficiently alleged standing.

### <u>Qualified immunity as to Acting Director Jeffreys</u>

The Defendants next argue they are entitled to qualified immunity from both of Dr. Thompson's constitutional claims.  The Court addresses that argument in full below.  As an initial matter, the Court addresses qualified immunity to the extent it is raised as defense to Dr. Thompson's request for equitable relief.

Dr. Thompson seeks prospective injunctive and declaratory relief from Acting Director Jeffreys.  The doctrine of qualified immunity "protects the defendants only against claims for damages; it does not protect the defendants against claims for injunctive relief." <u>Neely-Bey Tarik-El v. Conley</u>, 912 F.3d 989, 1008 (7th Cir. 2019). Accordingly, the qualified immunity defense does not apply to Dr. Thompson's claims for injunctive relief against Acting Director Jeffreys.

Having determined that Dr. Thompson has standing, the Court now turns to the summary judgment motions that pertain to the claims asserted against Defendants Baldwin, Melvin, Kennedy, Meredith, and Ruskin.

## DISCUSSION

### Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. See Driveline Systems, LLC v. Arctic Cat, Inc., 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." Driveline Systems, 936 F.3d at 579 (internal quotation marks omitted). Ultimately, there must be enough evidence in favor of the non-

movant to permit a jury to return a verdict in its favor.  <u>See</u> <u>Springer v. Durflinger</u>, 518 F.3d 479, 484 (7th Cir. 2008).  In ruling on cross-motions for summary judgment, the Court views "all facts and inferences in the light most favorable to the nonmoving party on each motion."  <u>Lalowski v. City of Des Plaines</u>, 789 F.3d 784, 787 (7th Cir. 2015).

## **<u>Defendants' motion for summary judgment on Count I</u>**

The Defendants argue that the First Amendment does not require a prison to allow in any book, no matter how "well written" or accurate, if the prison deems it a security risk.  <u>See</u> d/e 70, at 18.  Defendants contend that the themes and details presented in Dr. Thompson's book were simply incompatible with their penological goals.  <u>Id</u>. at 17-18.  Defendants further argue that, even if reasonable minds could disagree with their assessment, the deference to which prisons are entitled leaves room for error.  <u>Id</u>. at 19.  Alternatively, Defendants raise the affirmative defense of qualified immunity.  <u>Id</u>. at 21.

In response, Dr. Thompson contends that Defendants violated "her right to communicate with inmates without arbitrary

governmental invasion." See d/e 72, at 1. She challenges both the thoroughness of the Defendants' review and the reasonableness of their ultimate decision. Id.

Qualified immunity protects public officials from liability for money damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Van den Bosch v. Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). To defeat a qualified immunity defense by a state official, a plaintiff must show "(1) that the official violated a statutory or constitutional right; and (2) that the right was 'clearly established' at the time of the challenged conduct." Kemp v. Liebel, 877 F.3d 346, 350 (7th Cir. 2017) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). Courts are permitted to analyze the "clearly established" prong without first considering whether the alleged constitutional right was violated. Id. at 351.

To defeat the Defendants' qualified immunity defense, Dr. Thompson has the burden of demonstrating that the alleged violation of her First Amendment right was "clearly established." Id. "To be

14

clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Id. The key inquiry involves whether the official acted reasonably based on the particular circumstances he or she faced. Id.

While a plaintiff need not point to an identical case that finds the alleged violation unlawful, the statutory or constitutional question must be beyond debate due to controlling Supreme Court or Seventh Circuit precedent. Id. In the absence of controlling authority or persuasive authority that is based on a clear trend in the caselaw, a plaintiff can show that a law was clearly established by proving that defendant's conduct was "so egregious and unreasonable that . . . no reasonable official could have thought he was acting lawfully." Id. (quoting Abbott v. Sangamon County, Illinois, 705 F.3d 706, 724 (7th Cir. 2013)).

In determining if a law was clearly established, the Court must ensure that the right allegedly violated is defined at the appropriate level of specificity. Id. at 351. A court should not define "clearly established law at a high level of generality." Id. (quoting al-Kidd,

15

563 U.S. at 742). The crucial question is "whether the violative nature of *particular* conduct is clearly established." Id. (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)). "[T]he clearly established law must be "particularized" to the facts of the case." Id. (quoting White v. Pauley, 137 S. Ct. 548, 552 (2017)).

Citing Cavalieri v. Shepherd, 321 F.3d 616 (7th Cir. 2003) and Greason v. Kemp, 891 F.2d 829 (11th Cir. 1990), Dr. Thompson claims that the relevant inquiry is whether her right to communicate with prisoners and receive notice of and the opportunity to challenge the infringement of that right were clearly established. In Cavalieri, the Seventh Circuit addresses whether a police officer was deliberately indifferent to a jail inmate's risk of suicide. See Cavalieri, 321 F.3d at 622-23. In Greason, the Eleventh Circuit addressed whether clearly established law provided that the Eighth Amendment protected inmates from prison officials' deliberate indifference to their psychiatric needs. See Greason, 891 F.2d at 833. Neither case addresses whether an author's First Amendment rights are violated if her publication is not approved for distribution in a prison.

As the Plaintiff alleges, prison walls do not "bar free citizens from exercising their own constitutional rights by reaching out to those on the inside." Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).  However, the right "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." Id.  Dr. Thompson states that a "prison regulation that impinges on inmates' constitutional rights. . . is valid if it is reasonably related to legitimate penological interests." See Turner v. Safley, 482 U.S. 78, 89 1987).  Prisons may impose First Amendment restrictions "if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives." Beard v. Banks, 548 U.S. 521, 528 (2006) (internal quotations and citations omitted).

Under Turner and Thornburgh, courts evaluate regulations that deprive a prisoner's constitutional rights by applying a four-factor test:

> First, is there a valid rational connection between the prison regulation and the legitimate penological interest put forward to justify it.  Second, are there alternative means of exercising that right to remain open to prison inmates?  Third, what impact will accommodation of the asserted constitutional right have on guards and other inmates, and on the allocation of prison

resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard, 548 U.S. at 529 (internal quotation marks and citations omitted). In Beard, the Court found that a single justification for the prison's policy—the need to provide more incentives for better prison behavior—was enough to warrant summary judgment in favor of the defendant. See id. at 530. The Defendants here claim that it was reasonable for Pontiac to determine that a 720-page book that discusses a riot and hostage-taking would be detrimental to prison security. See d/e 74, at 17.

In Munson v. Gaetz, 673 F.3d 630 (7th Cir. 2012), the Seventh Circuit affirmed the dismissal of a prisoner's complaint because it could "readily discern the validity and rationality of the connection between" the legitimate penological interest in books containing drug-related content and restricting access to such books. Id. at 634. The court stated that, while the prison's publication officer could have said more than simply saying the book was about "DRUGS," there is not much else that would need to be said—"just as prison officials wouldn't need to say much in restricting access to books

containing information about how to make knives, or how to pick locks." Id.  It also seems reasonable that a prison official would not need to elaborate on his reason for restricting an inmate's access to a book about a prison uprising that led to 43 deaths.

Citing Riker v. Lemon, 798 F.3d 546 (7th Cir. 2015), Dr. Thompson claims that a general security interest is not enough to support a prison's decision to violate the prisoner's constitutional rights.  See id. at 557.  There must be evidence of a "specific security concern that bears a nexus to the prohibited conduct."  See id.  The issue in Riker was whether the Indiana Department of Corrections' decision to prohibit the marriage of an inmate and non-inmate violated the non-inmate's constitutional rights.  See id. at 548.  The court concluded that no evidence supported the Department's contention that prohibiting the marriage was necessary to support a safe and orderly institution.  See id. at 557.  However, in terms of security concerns, that scenario is not at all analogous to the situation before this Court.

The Defendants claim they prohibited the book "in part because it contains a detailed account of a historical prison riot and Pontiac

Correctional Center had just had an inmate disturbance days before the publication was reviewed" in February 2018, and because the book could encourage or instruct criminal activity or was "detrimental to security, good order, rehabilitation or discipline." See d/e 70, at 17-18. In response, Dr. Thompson alleges there is a dispute as to whether the book would jeopardize safety and security. See d/e 78, at 3. The Parties' respective experts disagree on that issue. Id. Dr. Thompson's expert, Richard Bard, believes that the book "poses no threat to the safety and security of inmates or correctional facility staff in Illinois prisons," while the Defense expert, Michael Atchison, is of the opinion that the book does pose a threat to the safety and security of facilities and was properly denied by Pontiac officials. See d/e 70, at ¶ 56. By agreeing that dispute exists, Dr. Thompson is acknowledging that Mr. Meredith and the other Defendants alleged to have violated her constitutional rights did not engage in conduct that was "so egregious and unreasonable that . . . no reasonable official could have thought he was acting lawfully." See Kemp, 877 F.3d at 351. It is fairly obvious that, if an expert believes the book could pose a security threat to prisons, then a reasonable official would not have known that he was violating Dr.

Thompson's First Amendment rights by banning an inmate from receiving the book.  Therefore, even assuming there were a constitutional violation, it was not clearly established that a prison's prohibition of a book about a violent prison uprising violated Dr. Thompson's First Amendment rights.

Qualified immunity provides "breathing room to make reasonable but mistaken judgments about open legal questions." al-Kidd, 563 U.S. at 743.  At most, the individual Defendants made reasonable but mistaken judgments.  Defendants Baldwin, Melvin, Kennedy, Meredith, Ruskin, and Jeffreys are entitled to summary judgment on the basis of qualified immunity as to Count I, to the extent Defendants are sued in their individual capacities.

### Motions for summary judgment on Count II

Both Dr. Thompson and the Defendants move for summary judgment on Count II, Dr. Thompson's procedural due process claim. The Court will first address whether the Defendants are entitled to summary judgment on Count II based on qualified immunity.

The parties agree that Dr. Thompson received neither notice of the censorship of her writings nor an opportunity to challenge the

ban.  <u>See</u> d/e 71, at ¶ 5.  The parties also agree that IDOC's "policies provide no mechanism for giving authors and senders of publications notice of, or an opportunity to contest or appeal, the decision to censor a book."  <u>Id</u>. at 6.  The parties dispute whether Dr. Thompson's First Amendment right to communicate with inmates entitles her to notice and opportunity to be heard before a prison may abrogate that right.  Dr. Thompson claims that her rights were violated when she did not "receive notice of and the opportunity to challenge the infringement of that right."  <u>See</u> d/e 72, at 26.  In response, the Defendants allege this is not a prisoner correspondence case—the case is about publications, and Dr. Thompson has not pointed to any case that puts Defendants on notice that the publication review was unlawful.  <u>See</u> d/e 79, at 2-3.

While the Seventh Circuit has not addressed the issue, other circuits have held that in some contexts senders of publications are entitled to some procedural safeguards if a prison censors their publications.  <u>See</u> <u>Perry v. Sec'y. Fla. Dep't of Corr.</u>, 664 F.3d 1359, 1368 (11th Cir. 2011) (concerning prison's rule prohibiting pen pal service from soliciting inmates); <u>Jacklovich v. Simmons</u>, 392 F.3d

420, 433 (10th Cir. 2004) (concerning the failure to notify publisher of a magazine focusing on prison issues when publication was not delivered to inmates); <u>Prison Legal News v. Cook</u>, 238 F.3d 1145, 1152-53 (9th Cir. 2001) (concerning the prison's rule prohibiting publishers from sending standard rate or bulk mail to prisoners); <u>Montcalm Publishing Co. v. Beck</u>, 80 F.3d 105, 109 (4th Cir. 1996) (noting that publishers of magazines that are disapproved for receipt by inmate subscribers are entitled to notice and opportunity to be heard); <u>Martin v. Kelley</u>, 803 F.2d 236, 243-44 (6th Cir. 1986) (holding that sender of letter to inmate that is censored by prison is entitled to notice and opportunity to protest).    Dr. Thompson contends that the Fourteenth Amendment entitles senders of publications to the same "minimum procedural safeguards" that inmates have of notice and an opportunity to be heard.  <u>See</u> <u>Miller v. Downey</u>, 915 F.3d 460, 466 (7th Cir. 2019) (reaffirming that "the decision to censor inmate must be accompanied by minimum procedural safeguards").  Because Dr. Thompson received no such notice, she contends she has alleged a violation of her Fourteenth Amendment rights.

However, the circuit court cases relied on by Dr. Thompson provide that notice must be given to a publisher or to the author of a letter.  None hold that the author of a publication has due process rights if the prison rejects the publication.  Moreover, a letter is fundamentally different than a book.  See Procunier v. Martinez, 416 U.S. 396, 418 (1974) rev'd by Abbott, 409 U.S. at 401 (noting the "interest of prisoners and their correspondents in uncensored communication by letter" is grounded in the First Amendment and constitutes a "liberty" interest under the Fourteenth Amendment). Significantly, the package containing Dr. Thompson's book had a return address to Amazon, the only sender known to Defendants. See d/e 70-14.  Dr. Thompson's name did not appear on the package sent to Mr. Dansberry and, in challenging the denial, Mr. Dansberry did not let Pontiac know that Dr. Thompson sent him the book.  See d/e 70-14 & 70-15.  There is little question that a notice requirement under these circumstances would place a significant burden on prisons.  The Court is unable to conclude that Dr. Thompson as the author had a right to procedural safeguards when Pontiac rejected her book.  Accordingly, Dr. Thompson has failed to allege the violation of her constitutional or statutory rights.

The Court concludes, however, that even if Dr. Thompson did allege a Fourteenth Amendment violation, the right was not clearly established.  When the Defendants censored <u>Blood in the Water</u>, it was not "beyond debate" that this principle extended to individual senders of publications.  While the Supreme Court held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a liberty interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment," <u>see</u> <u>Martinez</u>, 416 U.S. at 418, the Court later clarified that the logic of its "analyses in <u>Martinez</u> and <u>Turner</u> requires that <u>Martinez</u> be limited to regulations concerning outgoing correspondence" because the security implications are much different than are the security implications for incoming materials. <u>See</u> <u>Abbott</u>, 490 U.S. at 413.

Moreover, most of the cases on which Dr. Thompson relies address the procedural rights of commercial publishers, not authors like Dr. Thompson.  And none of those cases provide the Defendants

with fair warning that denying Dr. Thompson notice or opportunity to be heard was unconstitutional.

Further, Dr. Thompson has pointed to no controlling authority that shows that the right is clearly established. Absent a factually analogous Supreme Court or Seventh Circuit precedent, the Court is unable to conclude that the "constitutional question" here was "beyond debate." See al-Kidd, 563 U.S. at 741. Accordingly, the Court finds that to the extent Defendants are sued in their individual capacities on Count II, Defendants Baldwin, Melvin, Kennedy, Meredith, Ruskin, and Jeffreys are entitled to summary judgment on the basis of qualified immunity.

## **Motions for summary judgment on equitable claims**

Dr. Thompson also seeks equitable relief against Acting Director Jeffreys. The parties each seek summary judgment on these claims.

In order to obtain an injunction, a movant must establish (1) a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) irreparable harm will result if the injunction is not granted. See Foodcomm Intern. v. Barry, 328 F.3d 300, 303 (7th Cir. 2003). The Court must also weigh the balance of harm to the parties

if the injunction is granted or denied and evaluate the effect of an injunction on the public interest.  See Korte v. Sebelius, 735 F.3d 654, 665 (7th Cir. 2013).  "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor."  Id.

Dr. Thompson seeks summary judgment on both her as-applied and facial challenges to IDOC's publication-review policies.  An as-applied challenge is one that a law or regulation "is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others."  Surita v. Hyde, 665 F.3d 860, 875 (7th Cir. 2011).  A facial challenge is one that a challenged law or regulation is "invalid on its face" and "cannot be applied to anyone."  Ezell v. City of Chicago, 651 F.3d 684, 698 (7th Cir. 2011).

The Court first considers the as-applied challenge and whether Dr. Thompson can succeed on the merits.  As noted, "the decision to censor inmate mail must be accompanied by 'minimum procedural safeguards.'"  Miller, 915 F.3d at 466 (citations omitted).  The Defendants concede that Dr. Thompson received no "procedural

safeguards" before or after Pontiac censored <u>Blood in the Water</u>. Defendants further acknowledge that IDOC does not provide <u>any</u> safeguards to individuals like Dr. Thompson. However, the record does not indicate that Pontiac <u>could</u> have provided Dr. Thompson procedural due process. The Court, therefore, cannot say that Dr. Thompson's claim would succeed on the merits.

The Court concludes that a reasonable factfinder could not find in Dr. Thompson's favor. As the parties agree, Dr. Thompson's shipment did not indicate the identity of its sender. Instead, the "package containing Plaintiff's book had a return address to Amazon, and Amazon was the only sender known to Defendants." <u>See</u> d/e 71, at 13. Perhaps Defendants could have provided public notice by publication, <u>see</u> <u>Fogel v. Zell</u>, 221 F.3d 955, 962 (7th Cir. 2000) (analyzing procedural due process rights of unknown parties under <u>Mullane v. Cent. Hanover Bank & Tr. Co.</u>, 339 U.S. 306, 318 (1950)); the record does not indicate whether that could have been done. Because the Defendants did not know who sent Mr. Dansberry a copy of <u>Blood in the Water</u>, however, Dr. Thompson is not entitled to injunctive relief.

Summary judgment is warranted in favor of Acting Director Jeffreys.  As noted above and as the parties agree, Pontiac staff did not know Dr. Thompson sent Mr. Dansberry a copy of <u>Blood in the Water</u>.  There is no factual dispute regarding the issue.  Because Dr. Thompson is unable to succeed on her as-applied challenge, Acting Director Jeffreys is entitled to summary judgment on Dr. Thompson's claims for equitable relief.

Lastly, Dr. Thompson seeks a declaration that IDOC's "censorship policies and practices violate the U.S. Constitution."  <u>See</u> d/e 32, at 9.  Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, this Court must "decide the appropriateness of the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction."  <u>Steffel v. Thompson</u>, 415 U.S. 452, 468 (1974).

At this juncture, the parties' dispute is academic, if not entirely moot.  Dr. Thompson does not allege an intention to send <u>Blood in the Water</u>—or any other book—to another IDOC prisoner in the future.  This means that any "possible revival of the controversy's relevance  .  .  .  rests on" nothing more than an unarticulated

"speculative contingency."  <u>See</u> <u>Barany v. Butler</u>, 707 F.3d 285, 287 (7th Cir. 1983) (quotation omitted).  The Court concludes that issuing a "declaration at this late stage would not redress plaintiff[']s alleged but stale injuries."  <u>See</u> <u>UWM Student Ass'n v. Lovell</u>, 888 F.3d 854, 860 (7th Cir. 2018).

## CONCLUSION

For the reasons stated herein, the Plaintiff's Motion for Partial Summary Judgment [d/e 68] is DENIED.  The Defendants' Motion for Summary Judgment [d/e 70] is GRANTED.  The Clerk is DIRECTED to enter Judgment in favor of the Defendants.  The Clerk will terminate any pending motions as moot.  Any pending deadlines are terminated, and any scheduled settings are vacated.

ENTER: October 11, 2022

/s/ *Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE